## LAWRENCE LANGLAIS v. SUPERIOR PLATING, INC., AND ANOTHER.

226 N. W. 2d 891.

February 28, 1975—No. 45073.

*Richard D. Allen* and *Mark N. Stageberg,* for relators.

*Wurst, Bundlie, Carroll & Crouch* and *Norman W. Larsen,* for respondent.

Heard before Otis, Peterson, and Scott, JJ., and considered and decided by the court en banc.

SCOTT, JUSTICE.

The employer and its insurer seek review of a decision of the

Workmen's Compensation Commission awarding permanent total disability benefits of $80 per week from January 22, 1972. We affirm.

The employee, Lawrence Langlais, commenced employment with Superior Plating, Inc., in January 1946, and between that time and March 1969 worked as both a spray painter and electrofilm painter. This latter process involves spraying of an object which has been placed into a barrel container holding a dioxane mixed with dry graphite. The metal object to be sprayed is placed in a three-sided container and the sprayer stands and works from the area which would normally be the fourth side. A large fan to remove dust and fumes is located above one of the sides of the container. The sprayer is furnished with a mask for protection.

Employee first experienced chest pains in 1959, and was examined regularly between that time and March 1969. During that period he was twice hospitalized for several days in 1967 and 1968, and also received outpatient treatment twice in 1966 and again in 1968.

In early March 1969, employee developed more severe chest problems when he allegedly inhaled fumes from the electrofilm spray. The symptoms exhibited included exhaustion and pains in his arms and chest. He was hospitalized as a result from March 7 to March 21, 1969. All medical expenses and temporary total disability at the rate of $60 per week for 5½ weeks between March 7 and April 13, 1969, were paid by relator Home Insurance Company. He then returned to work in the shipping department with a salary reduced from $3.58 to $3.11 per hour. On September 1, 1969, his hourly wage was raised to $3.42, and on September 1, 1970, it was raised to $3.77. He continued employment until his layoff on January 21, 1972. During the return period there was occasional exposure to dust, cleaning solvents, and burn-off smoke, but his symptoms did lessen due to the environmental change.

At present, employee exhibits symptoms including occasional chest pains, shortness of breath, difficulty doing other than mini-

mum physical exercise, and difficulty when breathing any smoke, dust, or fumes. His condition is presently described by Dr. Richard Kronenberg of the University Chest Clinic, who has treated him since August 20, 1971, as "chronic obstructive pulmonary disease, emphysema, cor pulmonale." The employer's physician, Dr. Ralph Silas, similarly diagnosed the condition as "[c]hronic bronchitis, pulmonary emphysema and a history of cor pulmonale."

In addition, there was a history of cigarette smoking by the employee most of his life. Both physicians indicated that cigarette smoking could have produced symptoms and conditions exactly as those found. However, Dr. Kronenberg indicated that either employment conditions or cigarette smoking might be causal of the employee's physical condition, but was not medically certain which factor actually operated to create the malady. Dr. Silas concluded that cigarette smoking was the cause, and that the working conditions aggravated or heightened the problem, but he also was unable to determine causal percentage of the two factors.

The commission found that employee had been exposed to chemicals and fumes during all of his period of employment and that, following the contraction of the disease, he was further exposed to the fumes and chemicals, which exposure continued contraction of the disease. The commission also found that the employee's cigarette smoking was not a significant factor in the contraction of the disease.

The relators basically assign two errors in the findings of the commission:

(1) That since the date of the employee's first disablement was March 4, 1969, the compensation award should have been fixed at the rate then applicable ($60 per week) for permanent total disability, rather than the amount awarded ($80 per week); and

(2) That since the evidence indicates that cigarette smoking was a causative factor, benefits should be reduced pursuant to Minn. St. 1971, § 176.661.

■ Minn. St. 1971, § 176.66, subd. 1, which applies to this proceeding, provides as follows:

"The disablement of an employee resulting from an occupational disease, except where specifically otherwise provided, is to be treated as the happening of an accident within the meaning of the workmen's compensation law and the procedure and practice provided applies to all proceedings under this section, except where specifically otherwise provided herein. When used in this section, *'disability' means the state of being disabled from earning full wages at the work at which the employee was last employed and 'disablement' means the act of becoming so disabled."* [1] (Italics supplied.)

The question of whether the $60 or the $80 weekly rate applies depends upon the precise time at which the employee became "disabled from earning full wages at the work at which the employee was last employed." This court said, in Anderson v. City of Minneapolis, 258 Minn. 221, 224, 103 N. W. 2d 397, 400 (1960):

"It is obvious that the legislature intended a distinction to be drawn between contracting the disease and 'disablement.' The term 'disablement' is defined by the legislature and presents no serious difficulty in its application. The term 'contracted,' however, when used with reference to occupational diseases such as sclerosis, silicosis, berylliosis, tuberculosis, or other diseases which are of a progressive nature and often require the lapse of much time from their inception until they reach a stage where they are disabling or where it can be said that they have been legally contracted within the meaning of the Workmen's Compensation Act, has given rise to much difficulty."

With this in mind, the commission concluded, and this court

[1] Minn. St. 1971, § 176.66, subd. 1, has been amended to read: "The disablement of an employee resulting from an occupational disease shall be regarded as a personal injury within the meaning of the workmen's compensation law." L. 1973, c. 643, § 11.

agrees, that although the two disablements were causally related and part of the same condition, there were two separate disablements. The employee contracted the disease and was "disabled" within the meaning of the statute on March 4, 1969. However, after treatment and time away from the deleterious conditions, he was rehabilitated to the extent that he was able to work and would no longer qualify as "disabled" under that statute. In 1972, after renewed exposure to harmful elements and continuing contraction of his disease, the employee again became disabled within the meaning of Minn. St. 1971, § 176.66, subd. 1. Therefore, the rate of compensation then in effect, $80 per week, should have been and was properly utilized by the commission.

■ Minn. St. 1971, § 176.661, applicable in this proceeding, provides in part:

"Where an occupational disease is aggravated by any other disease or infirmity, not itself compensable, or where disease or death from any other cause, not itself compensable, is aggravated, prolonged, accelerated, or contributed to by an occupational disease, the compensation payable is to be reduced and limited to such proportion only of the compensation that would be payable if the occupational disease were the sole cause of disease or death, as such occupational disease, as a causative factor, bears to all the causes of such disease or death."

Under this statute, the employer contends that the evidence supports a finding that cigarette smoking was a causative factor in employee's disease and that the employer should be responsible only for 50 percent of the benefits awarded. The commission refused to so find, stating in its opinion: "And we, therefore, find that the employee's smoking was not a causative factor in any significance to be taken into account in this case."

The two physicians called at the hearing indicated contrary opinions in this area. Although both agreed that cigarette smoking could have produced symptoms similar to those exhibited, Dr. Kronenberg indicated that he could not be medically certain that

the smoking was causal here, and Dr. Silas concluded that smoking was the cause and that the employment conditions merely aggravated the employee's problems.

It is an established principle that a conflict in the opinions of expert witnesses is to be resolved by the trier of fact. Johnson v. Armour & Co. 297 Minn. 510, 210 N. W. 2d 247 (1973); Lee v. Minneapolis St. Ry. Co. 230 Minn. 315, 41 N. W. 2d 433 (1950). The finding of the commission that cigarette smoking was not a significant factor in the contraction of the disease in this case is, moreover, supported by ample evidence. The commission, in its opinion, indicated:

"In view of the heavy and constant exposure of the employee to fumes and chemicals at work, the testimony as to the amount of the employee's smoking and the testimony of Dr. Kronenberg, we cannot give much weight to Dr. Silas' opinion as to the causative effect of this employee's smoking to his present lung disease. Dr. Silas' opinion is merely one to consider in light of the entire record."

On the basis of the record in this case, it is difficult to arrive at any other conclusion. Therefore, apportionment should not be allowed, and the finding should be affirmed.

Attorneys fees in the amount of $400 shall be allowed to the respondent.

Affirmed.